RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0188p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

MATTHEW WARMAN,

>    *Plaintiff-Appellant*,

    *v.*

MOUNT ST. JOSEPH UNIVERSITY; MOUNT ST. JOSEPH
POLICE DEPARTMENT; KEVIN KOO; NORB
KOOPMAN; KAREN ELLIOTT; AMY METZGER aka
Amy Demko; PAIGE LEIGH ELLERMAN; NANCY
HINZMAN,

>    *Defendants-Appellees*.

No. 24-3042

───────────────

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:22-cv-00229—Timothy S. Black, District Judge.

Argued:  December 12, 2024

Decided and Filed:  July 18, 2025

Before:  COLE, WHITE, and DAVIS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Ronald A. Berutti, MURRAY-NOLAN BERUTTI LLP, Cedar Knolls, New Jersey,
for Appellant.  Ilana L. Linder, MANLEY BURKE, LPA, Cincinnati, Ohio, for Appellees.
**ON BRIEF:**  Ronald A. Berutti, MURRAY-NOLAN BERUTTI LLP, Cedar Knolls, New
Jersey, Matthew S. Okiishi, FINNEY LAW FIRM, LLC, Cincinnati, Ohio, for Appellant.  Ilana
L. Linder, Timothy M. Burke, MANLEY BURKE, LPA, Cincinnati, Ohio, for Appellees.

_____

**OPINION**

_____

COLE, Circuit Judge.  Matthew Warman, a former graduate student at Mount St. Joseph University (MSJU), objected to taking the COVID-19 vaccine on religious grounds.  When MSJU announced that it would require all students and employees to be vaccinated, Warman applied for a religious exemption.  Soon after, two officers with the MSJU Police Department (MSJPD) allegedly detained him at the campus police station for an hour, attempting to convince him to get the vaccine and disparaging his religious beliefs.  Warman later sued MSJU, MSJPD, and multiple individual employees.  The district court dismissed his complaint.  We affirm the district court in part and reverse in part.  We affirm the district court's dismissal of Warman's free exercise, equal protection, and disability discrimination claims with prejudice, and we affirm the dismissal of MSJPD from all counts with prejudice.  But because Warman plausibly pleaded that the two officers who detained him violated his Fourth Amendment rights, we reverse the district court's dismissal of Warman's wrongful detention claim and reinstate the claim against those defendants.  And we vacate the district court's declination of supplemental jurisdiction over Warman's state-law claims and remand for reconsideration.

I.

Because this case comes to us on an appeal of a motion to dismiss, "we recite the facts as they are alleged in the complaint." *Savel v. MetroHealth Sys.*, 96 F.4th 932, 937 (6th Cir. 2024).

MSJU is a Catholic university in Cincinnati, Ohio.  Around December 2020, Matthew Warman enrolled in MSJU's graduate nursing program.  A former Marine, Warman was medically discharged from the military due to internal injuries and brain tumors and suffered from "post-discharge depression and anxiety[.]"  (Second Am. Compl., R. 18, PageID 315.)  The Veterans Administration paid for Warman's schooling at MSJU, though this support was potentially subject to repayment if he failed to complete his studies.

MSJU began developing a COVID-19 vaccination policy and, upon commencement of the Fall 2021 term, informed students that it was going to require vaccination.  On September 9,

2021, Warman proactively sought a religious exemption. He also submitted a medical exemption letter from his doctor stating that Warman had a "medical need to avoid taking the COVID vaccines." (*Id.* at PageID 320.) A few days later, MSJU formally released its vaccine policy, which required all current students and employees to be fully vaccinated and to submit proof of vaccination by December 15, 2021, unless they obtained an exemption from the university.

On September 15, 2021, MSJPD's Chief of Police, Kevin Koo, called Warman to campus "to speak with him about [Warman's] decision to refuse the vaccine." (*Id.* at PageID 321.) After receiving six phone calls and an email, Warman arrived at the campus police station around 1:00 p.m. Koo and MSJPD Captain Norb Koopman "took [Warman] into a back room . . . and would not allow him to leave[.]" (*Id.*) The officers held Warman there for approximately one hour, telling him that he was required to stay until Karen Elliott, MSJU's Director of Mission and Ministry, arrived.

During that hour, Koopman and Koo berated Warman. They called Warman a "f*****g idiot" and told him that he should "get a new religion[,]" that his "beliefs were wrong[,]" and that he should "grow the f*** up and get the damn shot." (*Id.* at PageID 321.) They also handed him Veterans Administration paperwork and "told him to fill it out in order to resign from the [u]niversity[,]" said that they "would take him to the student center to get vaccinated[,]" and made other disparaging statements. (*Id.* at PageID 321–22.) Once Koopman and Koo learned that Elliott was unable to come to the police station, they allowed Warman to leave.

On September 17, 2021, MSJPD posted a memorandum from Koopman and Koo addressed to all officers that contained a picture of Warman, provided his class schedule, described his car, and listed both his license plate and student permit numbers. The memorandum included the following instruction:

> Below is the photograph of Matthew Warman. If you see him on Campus, stop him and check to see how he is doing. Politely ask why he is here. You are not to arrest him or tell him to leave Campus. Just keep an eye on him. (Keep in mind that he is a student here and has the right to be on Campus).

(*Id.* at PageID 323; Ex. A. of Compl., R. 1-1, PageID 30.) After the memorandum was posted, Warman described being watched and followed by campus police officers, including one incident where Koopman watched Warman take a call with his doctor.

On September 20, 2021, MSJU's Health Services Manager, Amy Metzger, denied Warman's requested religious exemption to MSJU's vaccination policy and referred Warman to MSJU's General Counsel, Paige Ellerman. The next day, Elliott called Warman to meet at her office. Koopman "stationed himself outside the door" of Elliott's office. (Second Am. Compl., R. 18, PageID 324.) During the meeting, Warman complained that he was being harassed by MSJPD officers, though Elliott did not follow up on Warman's concerns. Instead, Elliott explained to Warman the necessities of getting vaccinated and that vaccination did not violate Catholic edicts.

Undeterred by his meeting with Elliott, Warman appealed the denial of his religious exemption on September 22, 2021, reiterating that his "sincerely held religious beliefs precluded him, in his conscience, from accepting the vaccine." (*Id.* at PageID 325.) Warman also attempted to obtain a religious exemption from a hospital where he was set to perform clinical work but was informed by the Assistant Dean of MSJU's Department of Nursing, Nancy Hinzman, that he could only obtain an exemption through MSJU. On October 4, 2021, Metzger denied Warman's appeal for a religious exemption.

Believing that he was still being harassed by MSJPD officers, Warman filed a complaint on the campus police website but received no response. After Warman filed this complaint, MSJPD retaliated by reporting Warman to the FBI and having FBI Agent Ron Willison contact Warman's psychiatrist. That call, according to Warman, sought "to cause [] Warman's psychiatrist to falsely believe that [] Warman presented a physical danger to students and staff on campus, a risk of danger to himself, and a risk for causing campus violence[.]" (*Id.* at PageID 328.)

As a result of this "harassment" and "intimidation[,]" Warman withdrew from MSJU and was obligated to return stipend funds he had received from the Veterans Administration for

attending graduate school.  (*Id.* at PageID 330.)  He also alleges that the events caused him both physical and emotional trauma.

Warman sued MSJU, MSJPD, and the individual employees he believed were responsible for his harassment on campus and the implementation of MSJU's vaccination policy. He filed an amended complaint, which defendants moved to dismiss for failure to state a claim. The district court denied defendants' motion and granted Warman leave to further amend the complaint to add new evidence.

In his second amended complaint, Warman sued MSJU and its Director of Mission and Ministry Karen Elliott, Health Services Manager Amy Metzger a/k/a Amy Demko, General Counsel Paige Ellerman, and the Assistant Dean in MSJU's Department of Nursing Nancy Hinzman.  He also sued MSJPD and MSJPD officers Kevin Koo and Norb Koopman.  He further sued "John Does" and "ABC Agenc[ies]" which acted like the named parties toward Warman and/or were responsible for creating and administering MSJU's vaccine policy.  Additionally, he brought claims against the FBI and FBI Agent Ron Willison, though he later voluntarily dismissed his claims against both.

Warman brought several federal and state claims against these defendants.  Under 42 U.S.C. § 1983, he alleged that various defendants conspired to violate or violated his rights to free exercise of religion, to equal protection, and against unlawful detention.[1]  He also alleged that various defendants discriminated against him based on his actual or perceived disabilities under the Rehabilitation Act, 29 U.S.C. § 793.  His state law claims include intentional infliction of emotional distress, invasion of privacy, false light, unlawful detention, false imprisonment, tortious interference with contract, breach of contract, breach of covenant of good faith and fair dealing, assault, civil conspiracy, negligence, and negligent hiring and retention.

Again, defendants moved to dismiss.  This time, the district court granted the motion and dismissed Warman's federal claims with prejudice.  Upon dismissal of all federal claims, the

---

[1]Warman also alleged a Second Amendment violation.  He forfeited that claim at oral argument, so we do not address it here.

district court declined to exercise supplemental jurisdiction over Warman's state claims. Warman timely appealed.

## II.

We review grants of motions to dismiss de novo. *Nugent v. Spectrum Juv. Just. Servs.*, 72 F.4th 135, 138 (6th Cir. 2023). In doing so, we accept all well-pleaded allegations in the complaint as true and view the facts in the light most favorable to the plaintiff. *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016). To survive a motion to dismiss, the complaint must present facts that, if accepted, "sufficiently 'state a claim to relief that is plausible on its face.'" *Coley v. Lucas County*, 799 F.3d 530, 537 (6th Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). We "must reverse the district court's dismissal unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Meriwether v. Hartop*, 992 F.3d 492, 498 (6th Cir. 2021) (internal citations and quotation marks omitted).

Warman's federal causes of action can be grouped into two categories: three claims brought under 42 U.S.C. § 1983 and one claim brought under the Rehabilitation Act, 29 U.S.C. § 793. We examine each category in turn, and then consider the district court's declination of supplemental jurisdiction over Warman's state law claims.

## III.

We begin with Warman's three claims under 42 U.S.C. § 1983. We scrutinize the dismissal of actions brought under civil rights statutes like § 1983 with "special care." *Inner City Contracting, LLC v. Charter Twp. of Northville*, 87 F.4th 743, 754 (6th Cir. 2023) (citation omitted). To sue under § 1983, a plaintiff must show that he was denied a constitutional right, and that the deprivation was caused by defendants acting under color of state law. *Carl v. Muskegon County*, 763 F.3d 592, 595 (6th Cir. 2014).

Warman alleges the denial of his rights against unlawful detention under the Fourth Amendment, to free religious exercise under the First Amendment, and to equal protection under

the Fourteenth Amendment. The district court determined that Warman failed to establish a constitutional violation in all three claims. Examining each, we find that only Warman's unlawful detention claim merits reconsideration. We begin there.

A.

1.

The Fourth Amendment, made applicable to the states through the Fourteenth Amendment, prohibits law enforcement officers from seizing an individual "except after establishing probable cause that the individual has committed, or is about to commit, a crime." *Radvanksy v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005) (citation omitted). "[A] consensual encounter becomes a seizure when 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *United States v. Jones*, 562 F.3d 768, 772 (6th Cir. 2009) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).[2]

Bringing his unlawful detention claim against MJPD, Koopman, and Koo, Warman alleges that MSJPD officers seized him at various points.[3] His only substantive allegation stems from his detention by Koopman and Koo at the campus police station for approximately an hour. Considering the totality of the circumstances, Warman has plausibly alleged that he was seized for Fourth Amendment purposes during that incident. While Warman arrived at the station voluntarily, he was then told that he was not free to leave until Elliott arrived, and we have previously held that a reasonable person would not feel free to leave when directed by police to remain. *See United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004). Koopman and Koo

---

[2]Relying on an unpublished decision, the district court used several factors outlined in *United States v. Swanson*, 341 F.3d 524 (6th Cir. 2003) to determine whether a reasonable person in Warman's circumstances would feel free to leave. But *Swanson* outlines factors for determining whether a defendant was subject to custodial interrogation with respect to a Fifth Amendment claim. *Id.* at 528–29. While some of our unpublished decisions have conflated these tests, our binding precedent clarifies that "Fourth Amendment seizure and Fifth Amendment custody analyses are different." *Lawson v. Creely*, 137 F.4th 404, 416 (6th Cir. 2025); *see also United States v. Salvo*, 133 F.3d 943, 949 (6th Cir. 1998).

[3]This count also appears to assert a First Amendment retaliation claim. But since Warman does not develop that argument, we deem it waived and construe the count as raising only a Fourth Amendment unlawful detention claim.

also took Warman into the back room of the station, as opposed to the front office or another public space where he might have felt empowered to walk away. *See Mendenhall*, 446 U.S. at 555. And it is also plausible that a reasonable person in Warman's circumstances would not have felt free to terminate the encounter given the officers' hostile "language [and] tone of voice," including swearing and verbal disparagements. *Id.* at 554.

The defendants argue and the district court determined that a reasonable person in Warman's position would have felt free to leave. Warman, however, specifically alleges that "Koo and Koopman took [] Warman into a back room of the campus police station and *would not allow him to leave . . . .*" (Second Am. Compl., R. 18, PageID 321 (emphasis added).) This is a factual allegation—not a conclusory legal statement.

Defendants also maintain that Koopman and Koo acted as fellow veterans concerned for Warman's wellbeing and only intended to encourage Warman to get vaccinated. That may be true. But a "police officer's subjective intent in detaining an individual is irrelevant so long as that intent is not conveyed to the individual in a way that results in the individual believing that he or she is not free to leave." *United States v. Campbell*, 486 F.3d 949, 954 (6th Cir. 2007).

Since a reasonable person would not feel free to leave when directed by police to remain, Warman was seized for Fourth Amendment purposes. *See Richardson*, 385 F.3d at 630. And, as Warman had not committed any crime, was not suspected to have committed any crime, and had not even violated the university's vaccine policy at that time, the officers lacked probable cause. Thus, he plausibly established a denial of his Fourth Amendment rights. Of course, further evidence may reveal otherwise. But at this juncture, we must consider Warman's allegations to be true.

2.

Having determined that Warman has alleged facts showing a plausible violation of his Fourth Amendment rights, we examine whether Warman properly pleaded the claim against a state actor. *See Howell v. Father Maloney's Boys' Haven, Inc.*, 976 F.3d 750, 752 (6th Cir. 2020). As noted earlier, Warman brings his Fourth Amendment claim against MSJPD, Koopman, and Koo. First, we address whether MSJPD is a legal entity capable of being sued in

its own right.   Deciding that it is not, we then evaluate whether Warman has established Koopman's and Koo's liability under § 1983.   Finally, we consider the officers' qualified immunity defense.

i.

For an entity that is not an individual or a corporation, the "[c]apacity to sue or be sued[,]" and therefore be deemed sui juris, is generally governed "by the law of the state where the court is located[.]" Fed. R. Civ. P. 17(b)(3).  To be considered sui juris in Ohio, a party must have "full capacity and rights to sue or be sued." *Urb. Necessities 1 Stop Shop, LLC v. City of Cleveland*, No. 1:22-CV-2014, 2023 WL 6383825, at *2 (N.D. Ohio Sept. 29, 2023) (citing *Mollette v. Portsmouth City Council,* 863 N.E.2d 1092, 1094 (Ohio Ct. App. 2006)).

MSJPD "is the police and public safety department of MSJU[.]"  (Second Am. Compl., R. 18, PageID 313.)  It is also a state-commissioned law enforcement agency, operating under Ohio Revised Code § 1713.50, a statute which empowers a private college or university to establish a campus police department.  Although confined to campus property, officers operating under § 1713.50 are "vested . . . with the same powers and authority that are vested in a police officer of a municipal corporation or a county sheriff[.]" Ohio Rev. Code § 1713.50 (C).

Warman argues that, as a state-commissioned law enforcement agency, MSJPD is a public entity subject to suit.  Defendants respond that, as a subdivision of MSJU and under its control, MSJPD is not sui juris.  The district court agreed with the defendants, citing to circuit precedent that holds, as subdivisions of their municipalities, municipal police departments and sheriff's offices are not sui juris.

Indeed, police departments are generally not sui juris under Ohio law.  *See, e.g.*, *Petty v. County of Franklin*, 478 F.3d 341, 347 (6th Cir. 2007) (noting that, "under Ohio law, a county sheriff's office is not a legal entity capable of being sued for purposes of § 1983") (abrogated on other grounds by *Bailey v. City of Ann Arbor*, 860 F.3d 382 (6th Cir. 2017)); *Carmichael v. City of Cleveland*, 571 F. App'x 426, 435 (6th Cir. 2014) (collecting cases).  Rather, they are "sub-units" of the municipalities or counties that they serve. *Jones v. Marcum*, 197 F. Supp. 2d 991, 997 (S.D. Ohio 2002).  Like a municipal police department is a sub-unit of its municipality, a

private campus police department is a sub-unit of its university and "merely [a] vehicle[] through which the [university] fulfills its policing functions." *Williams v. Dayton Police Dept.*, 680 F. Supp. 1075, 1080 (S.D. Ohio 1987). Ohio Rev. Code § 1713.50 stipulates that a campus police department established under the statute is created, controlled, staffed, and insured by the university's board of trustees. Ohio Rev. Code § 1713.50(B)–(D). And, even if we considered private campus police departments as akin to other university offices, university subdivisions are not sui juris in Ohio, and therefore, plaintiffs cannot sue them separately from the university itself. *See, e.g.*, *Winkle v. Loranger*, No. 3:14-CV-020, 2014 WL 1573654, at *4 (S.D. Ohio Apr. 17, 2014). Federal courts have accordingly dismissed claims brought against university subdivisions. *Id.*

The district court thus correctly determined that MSJPD is not a legal entity subject to suit; MSJU is the proper defendant. *See Fleck v. Trs. of Univ. of Pa.*, 995 F. Supp. 2d 390, 402 (E.D. Pa. 2014) (determining that a private university's police department is "not an entity capable of being sued" and the "[u]niversity itself . . . is the proper defendant for purposes of a § 1983 suit"). But Warman does not name MSJU in his Fourth Amendment claim in this lawsuit.[4]

---

[4]Warman does, however, sue Koopman and Koo in their individual and *official* capacities. An official-capacity suit "is, in all respects other than name, to be treated as" a suit against the entity "of which [the named defendant] is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (citation omitted). Koopman and Koo work for MSJU, so we must treat the official-capacity suit against them as a suit against MSJU. A private company whose employees "perform a traditional state function" may be "sued under § 1983 as one acting under color of state law." *Rouster v. County of Saginaw*, 749 F.3d 437, 453 (6th Cir. 2014) (quoting *Street v. Corrections Corp. of Am.*, 102 F.3d 810, 814 (6th Cir.1996)). But it "cannot be held liable on the basis of respondeat superior or vicarious liability." *Id.* Rather, drawing from the standard the Supreme Court created for municipal liability in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), we have held that a plaintiff bringing a § 1983 suit against a private company must prove that his "constitutional rights were violated" and that the company's "policy or custom . . . was the moving force behind" the violation. *Savoie v. Martin*, 673 F.3d 488, 494 (6th Cir. 2012) (citation omitted). "All other circuits that have addressed the issue have reached the same conclusion, extending the *Monell* standard to private corporations." *Shields v. Illinois Dep't. of Corr.*, 746 F.3d 782, 790, 790 n.2 (7th Cir. 2014) (collecting cases from the First, Second, Third, Fourth, Sixth, Eighth, Ninth, Tenth, and Eleventh Circuits); *see also Maniaci v. Georgetown Univ.*, 510 F. Supp. 2d 50, 62 (D.D.C. 2007) (noting that "various circuits have applied Section 1983 and its limitations as set forth in *Monell* to private institutions such as Georgetown University where such private institutions employ" actors who wield state power). Here, as we elsewhere explain, Koopman and Koo violated Warman's Fourth Amendment rights by detaining him at the campus police station. But Warman has not even attempted to show that MSJU had a policy or custom of unlawful detention. Indeed, Warman does not cite the *Monell* standard in his brief or explain that it applies here. Instead, Warman's Fourth Amendment arguments focus solely on the *officers'* unlawful conduct.

Resisting this outcome, Warman relies on an Ohio Supreme Court case, *State ex rel. Schiffbauer v. Banaszak*, 33 N.E.3d 52 (Ohio 2015), for the proposition that MSJPD is a public office and therefore sui juris. In *Banaszak*, the Ohio Supreme Court held that the police department of a private university established under Ohio Rev. Code § 1713.50(B) constituted a public office that could be compelled to produce public records pursuant to Ohio's Public Records Act, even if the private university itself could not be compelled to do so. 33 N.E.3d at 55. Ohio courts, however, have noted that whether a public office is sui juris for the purposes of the special statutory proceeding defined in the Ohio Public Records Act is a distinct question from that entity's sui juris status in other contexts. *See, e.g.*, *Barnes v. City of Cleveland Div. of Recs. Admin.*, 167 N.E.3d 51, 57 (Ohio Ct. App. 2021).

We recognize that the campus police department of a private university differs from a municipal police department in important ways, particularly for plaintiffs like Warman seeking relief under § 1983. Had Warman been detained by a municipal department, he could have sued the municipality, which is a state actor. Yet, despite Ohio law endowing campus officers with the same powers as municipal police officers, the appropriate sui juris entity for a campus police department is a private university. This complication, however, does not preclude Warman from obtaining relief under § 1983, as private individuals or entities may still be considered state actors for § 1983 purposes.

We therefore affirm the district court's dismissal of all claims against MSJPD on the basis that it is not an entity subject to suit.

ii.

We next consider whether Warman has carried his burden of showing that the remaining defendants—Koopman and Koo—are state actors and therefore subject to liability under § 1983. *See Inner City*, 87 F.4th at 757; *Howell*, 976 F.3d at 752. He has met his burden.

Private individuals may be considered state actors for the purposes of § 1983 actions if they "exercise power 'possessed by virtue of state law' and if they are 'clothed with the authority of state law.'" *Carl*, 763 F.3d at 595 (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). We ask whether the private individual's "conduct is fairly attributable to the State."

*Howell*, 976 F.3d at 752 (quoting *Filarsky v. Delia*, 566 U.S. 377, 383 (2012) (internal quotation marks omitted)). And we can also inquire: (1) whether the state compelled the individual's conduct ("the state-compulsion test"); (2) whether a symbiotic relationship existed between the state and the individual ("the nexus test"); and (3) whether the individual engaged in an action traditionally handled exclusively by the state ("the public-function test"). *Nugent,* 72 F.4th at 140 (internal citation omitted); *Ciraci v. J.M. Smucker Co.*, 62 F.4th 278, 281 (6th Cir. 2023).

While the district court determined that Koopman and Koo were not state actors with respect to Warman's free exercise and equal protection claims, it did not explicitly address whether Koopman and Koo qualified as state actors with respect to Warman's Fourth Amendment claim, dismissing the claim on the basis that it was barred by qualified immunity. Warman reads the district court's order as establishing that Koopman and Koo are not state actors. We make explicit what the district court did not: even as officers of a private university's campus police department, Koopman and Koo acted under color of state law and are therefore subject to § 1983 liability. *See, e.g.*, *Bartell v. Lohiser*, 215 F.3d 550, 556 (6th Cir. 2000) ("It is well settled that private parties that perform fundamentally public functions . . . are regarded as acting 'under the color of state law' for purposes of § 1983." (citation omitted)).

First, a brief examination of the state statute that delegates police power to MSJPD reveals that Ohio clothed MSJPD's officers with the authority of state law. When examining the powers granted to campus police officers by Ohio Rev. Code § 1713.50, the Ohio Supreme Court observed in *Banaszak* that campus police officers operating pursuant to the statute are "sworn, state-certified police officers who exercise plenary police power[.]" 33 N.E.3d at 52–53. Like the campus police department in that case, MSJPD

> exercises a function of government, namely the basic police power of enforcing laws and maintaining the peace within its jurisdiction. Its officers therefore have the power to search and confiscate property, to detain, search, and arrest persons, and to carry deadly weapons.

*Id.* at 54. Indeed, § 1713.50 expressly vests each member of a campus police department appointed under it "with the same powers and authority that are vested in a police officer of a municipal corporation or a county sheriff" and permits them to exercise,

concurrently with the law enforcement officers of the political subdivisions in which the private college or university is located, the powers and authority granted to them . . . to preserve the peace, protect persons and property, enforce the laws of [Ohio], and enforce the ordinances and regulations of the political subdivisions in which the private college or university is located[.]

Ohio Rev. Code § 1713.50(C). Consequently, when engaging in law enforcement activities pursuant to the statute, MSJPD officers "exercise power possessed by virtue of state law and . . . are clothed with the authority of state law." *Carl*, 763 F.3d at 595 (internal citation and quotation marks omitted).

Our traditional state actor inquiry leads to the same outcome. The public function test is the most useful of the three inquiries for these circumstances, and our precedent on private security guards is analogous. For example, in *Romanski v. Detroit Ent., L.L.C.*, 428 F.3d 629, 637 (6th Cir. 2005), we decided that "[w]here private security guards are endowed by law with plenary police powers such that they are *de facto* police officers, they may qualify as state actors under the public function test." The court relied on "[t]he fact that [the state] delegated a part of the police power to licensed private security guards, which it had traditionally and exclusively reserved for itself," to find state action. *Lindsey v. Detroit Ent., LLC*, 484 F.3d 824, 831 (6th Cir. 2007) (discussing *Romanski*). In other words, what differentiates a private security force considered a state actor from a purely private security force is some "identifiable police power" that is "not possessed by citizens of [a state] at large, but instead reside[s] only in the state, its agents, and those persons who the state empower[s] and regulate[s] by statute." *Id.*; *see also Payton v. Rush-Presbyterian St. Luke's Med. Ctr.*, 184 F.3d 623, 629 (7th Cir. 1999) ("[I]f the state cloaks private individuals with virtually the same power as public police officers, and the private actors allegedly abuse that power to violate a plaintiff's civil rights, that plaintiff's ability to claim relief under § 1983 should be unaffected.").

Like the private security guards in *Romanski*, MSJPD's officers are subject to certain statutory limitations and the oversight of the university, but they exercise police powers that typically reside only in the state. Moreover, MSJPD holds itself out as being "a commissioned law enforcement agency by the State of Ohio, that operates under [Ohio Rev. Code §] 1713.50" on its website. *MSJ Police Department and Public Safety*, Mount St. Joseph University,

https://www.msj.edu/student-life/public-safety-campus-police/ (last visited May 7, 2025). Its website includes a photograph of its uniformed officers and its vehicles, which are emblazoned with "POLICE" in large letters. *Id.* MSJPD officers, therefore, both possess the same powers and appearance of public officers, even if the "uniforms, vehicles, and badges of members of a campus police department" are required to be "distinct from those of the law enforcement agencies of the political subdivisions which the private [university] . . . is located." Ohio Rev. Code § 1713.50(B). Where a private university's officers violate a plaintiff's civil rights, a "plaintiff's ability to claim relief under § 1983 should be unaffected." *See Payton*, 184 F.3d at 629.

The Third Circuit has held similarly in the campus police context. In *Henderson v. Fisher*, 631 F.2d 1115 (3d Cir. 1980), it determined that the University of Pittsburgh's campus police qualified as state actors, in part, because the "Pennsylvania legislature ha[d] delegated to the campus police of the University of Pittsburgh the very powers which the municipal police force of Pittsburgh possesses." *Id.* at 1118. Consequently, the Third Circuit reasoned that "the delegation of police powers, a government function, to the campus police buttress[ed] the conclusion that the campus police act under color of state authority." *Id.*; *see also Fleck,* 995 F. Supp. 2d at 400 (determining that campus police officers, endowed by law with plenary police powers, acted as state actors and were subject to liability under § 1983).

Accordingly, where Koopman and Koo "exercised power possessed by virtue of state law and made possible only because [they were] clothed with the authority of state law[,]" they meet the "traditional definition" of acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 49 (1988) (internal citation and quotation marks omitted). Koopman and Koo did so when detaining Warman at the campus police station. Koopman and Koo thus qualify as state actors subject to § 1983 liability for Warman's Fourth Amendment claim.

iii.

Based on the foregoing, Warman's complaint properly pleads a violation of his Fourth Amendment rights by state actors. Nonetheless, defendants argue that the claim is barred by qualified immunity, and the district court agreed. "Qualified immunity shields government

officials in the performance of discretionary functions from standing trial for civil liability unless their actions violate clearly established rights." *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 608 (6th Cir. 2015) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). We review a district court's finding that qualified immunity applied to officers' conduct de novo. *Pleasant View Baptist Church v. Beshear*, 78 F.4th 286, 295 (6th Cir. 2023).

As a threshold issue, it is unclear whether Koopman and Koo are entitled to raise a qualified immunity defense as privately employed campus police officers. "Section 1983 creates a species of tort liability that on its face admits of no immunities." *Wyatt v. Cole*, 504 U.S. 158, 163 (1992) (citation omitted). Instead, the Supreme Court has "accorded immunity where a 'tradition of immunity was so firmly rooted in the common law and was supported by such strong policy reasons that Congress would have specifically so provided had it wished to abolish the doctrine.'" *Richardson v. McKnight*, 521 U.S. 399, 403 (1997) (quoting *Wyatt*, 504 U.S. at 164) (cleaned up); *see also Filarsky*, 566 U.S. at 385–89. That analysis as applied to various privately employed state actors seeking the protection of qualified immunity has yielded different answers, in both the Supreme Court and in this circuit. *Compare Filarsky*, 566 U.S. at 393–94 (a private individual retained by the government to conduct an official investigation may assert qualified immunity), *with Richardson,* 521 U.S. at 401 (prison guards employed by a private prison management firm may not assert qualified immunity), *Harrison v. Ash*, 539 F.3d 510, 522 (6th Cir. 2008) (nurses employed by a private medical provider to provide medical services in prisons and jails may not assert qualified immunity), *and McCullum v. Tepe*, 693 F.3d 696, 704 (6th Cir. 2012) (a private doctor employed by the government may not assert qualified immunity).

It is "well established" that public police officers may assert qualified immunity. *United Pet Supply, Inc. v. City of Chattanooga*, 768 F.3d 464, 479 (6th Cir. 2014). But, although MSJPD is a state-commissioned law enforcement agency, it is also a sub-unit of a private university. Therefore, it is not apparent whether its officers should be considered akin to public police officers who may assert qualified immunity or considered private actors endowed with plenary police powers by Ohio law and so potentially ineligible. No clear authority from this court or the Supreme Court offers an answer. *See Hoggard v. Rhodes*, 141 S. Ct. 2421, 2422

(2021) (Thomas, J., respecting denial of certiorari) ("[W]hy should university officers, who have time to make calculated choices about enacting or enforcing unconstitutional policies, receive the same protection as a police officer who makes a split-second decision to use force in a dangerous setting? We have never offered a satisfactory explanation to this question."). Therefore, as other federal courts have observed, "the question [of] whether university-employed [] police can even assert qualified immunity is a complicated one." *Wheeler v. Am. Univ.*, 619 F. Supp. 3d 1, 22 (D.D.C. 2022).

The framework to resolve this question offered by the Supreme Court in *Richardson* and *Filarsky* "demands a fact-intensive analysis." *United Pet Supply*, 768 F.3d at 479. But neither side meaningfully engages with the required inquiry. When asserting qualified immunity below, the defendants did not cite to any authority that establishes their entitlement to a qualified immunity defense. Warman briefly challenged that entitlement in his reply below, citing Justice Thomas's concurrence in *Hoggard*, but going no further. 141 S. Ct. at 2422. The district court, for its part, did not address the issue.[5]

The arguments made before us are similarly sparse. Warman again gestures to the mere existence of the issue but offers no developed argument following the framework laid out in *Richardson* and *Filarsky*. "It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (quoting *Citizens Awareness Network, Inc. v. U.S. Nuclear Regul. Comm'n*, 59 F.3d 284, 293–94 (1st Cir. 1995)). As such, "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation," as here, "are deemed waived." *See id.*

We largely do not consider waived arguments. *See United States v. Ellison*, 462 F.3d 557, 560 (6th Cir. 2006). Only "exceptional cases" justify deviating from this general rule, for

---

[5]In its analysis of Warman's free exercise and equal protection claims, the district court considered whether Koopman and Koo constitute state actors and determined that they do not. Addressing Warman's Fourth Amendment claim, however, the district court proceeded directly to Koopman and Koo's qualified immunity defense without first concluding that Koopman and Koo are state actors. If the district court did so by assuming that Koopman and Koo were the equivalent of public police officers, it did not explain how they could be considered state actors for the Fourth Amendment claim but not the others.

example, occasions where "failing to consider the argument would result in a 'plain miscarriage of justice.'" *Id.* (quoting *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1461 (6th Cir. 1988)). If we agreed with the district court that Warman fails to overcome Koopman's and Koo's qualified immunity defense, this would likely be that rare case. While the district court "did not expressly state" that Koopman and Koo were eligible to raise a qualified immunity defense, "such a conclusion was necessarily implied by the court's ruling" that qualified immunity barred Warman's Fourth Amendment claim. *Id.* at 560. If Koopman and Koo are in fact not even eligible for qualified immunity, "failing to consider the issue would result in a plain miscarriage of justice—namely, allowing a conclusion of law to stand that is clearly in error." *Id.* at 561.

But, even if we assume without deciding that Koopman and Koo can raise a qualified immunity defense, that defense—briefed fully by both parties—fails on this motion to dismiss. It is "generally inappropriate for a district court to grant a [Rule] 12(b)(6) motion to dismiss on the basis of qualified immunity." *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015). We make an exception, however, where plaintiff's allegations fail to "state a claim of [a] violation of clearly established law." *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

As discussed above, Warman plausibly alleges a violation of his Fourth Amendment rights. So, we must consider whether "the right was so clearly established that a reasonable official would understand that the particular conduct at issue violated that right." *Crockett v. Cumberland Coll.*, 316 F.3d 571, 579 (6th Cir. 2003). Though a plaintiff need not point to a case with an identical fact pattern, a plaintiff must identify sufficiently analogous cases from which a reasonable official would understand that his conduct violated the plaintiff's constitutional right. *Pleasant View*, 78 F.4th at 295.

Warman does so. The right to be free from seizure without probable cause is "clearly established." *See Tlapanco v. Elges*, 969 F.3d 638, 648 (6th Cir. 2020); *see also Centanni v. Eight Unknown Officers*, 15 F.3d 587, 592 (6th Cir. 1994). And, as discussed above, Koopman and Koo lacked probable cause to detain Warman on this record.

Accordingly, we reverse the district court's grant of qualified immunity.  In doing so, we leave open the question of whether Koopman and Koo may assert qualified immunity in the first instance.  While resolving the question may "materially advance" the progress of litigation, the issue was not "presented with sufficient clarity and completeness" below to justify us exercising our "limited" discretion to reach it here.  *Pinney*, 838 F.2d at 1461; *see also In re Hood*, 319 F.3d 755, 760 (6th Cir. 2003).  If Koopman and Koo again raise a qualified immunity defense at a later stage in this litigation, the district court should then resolve the question.

B.

We next consider Warman's free exercise claim.  The Free Exercise Clause, applied to the states through the Fourteenth Amendment, protects against both direct and indirect coercion or penalties on the free exercise of religion.  *See Dahl v. Bd. of Trs. of W. Mich. Univ.*, 15 F.4th 728, 731 (6th Cir. 2021).  But not every burden on religious exercise is unconstitutional.  *Id.* at 733.

Warman brings his free exercise claim against MSJU, MSJPD, Elliott, Metzger, Ellerman, Hinzman, Koopman, and Koo.  He alleges that these defendants "acted to discriminate and/or retaliate against [] Warman for [] freely exercising his religious preference, based upon his sincerely held beliefs, not to be vaccinated."  (Second Am. Compl., R. 18, PageID 331.)  Warman's free exercise allegations fall into two categories: (1) Koopman's and Koo's disparaging remarks about Warman's religion, and (2) the denial of Warman's requested religious exemption under MSJU's vaccine policy, as carried out by MSJU administrators.

For the first category, Warman has not shown that his religious exercise was burdened.  "While [Warman] has presented facts suggesting that [he] was exposed to religious information [by Koopman and Koo] with which [he] did not agree, [he] has given no indication that the information *coerced* [him] into doing or not doing anything."  *Nikolao v. Lyon*, 875 F.3d 310, 316 (6th Cir. 2017).  And while he also presented facts that Koopman and Koo disparaged his religious beliefs, "actions that merely offend or cast doubt on religious beliefs do not on that account violate free exercise."  *Mozert v. Hawkins Cnty. Bd. of Educ.*, 827 F.2d 1058, 1068 (6th

Cir. 1987) (quoting *Grove v. Mead School Dist. No. 354*, 753 F.2d 1528, 1543 (9th Cir. 1985)). Rather, "[a]n actual burden on the profession or exercise of religion is required." *Id.*

For the second category, Warman has not shown that the defendants involved in the exemption process under MSJU's vaccine policy were "engaged in state action." *See Lindke v. Freed*, 601 U.S. 187, 195 (2024). Warman alleges that MSJU's vaccine policy was implemented by school administrators Karen Elliott, Amy Metzger, Paige Ellerman, and Nancy Hinzman. (*See* Second Am. Compl., R. 18, PageID 311, 320 (stating that these defendants "created and acted to carry out" the University's vaccine policy, including "assessing religious exemption requests").) But MSJU is a *private* school, and all the administrators alleged to be involved in handling Warman's exemption requests were private employees.

Warman argues only that the administrators are state actors "with respect to their direction of MSJPD." (Appellant Br. 18–19.) As Warman sees it, Koo and Koopman were state actors because they exercised state police power "traditionally exclusively reserved to the state," and MSJU administrators were state actors because they allegedly "control[led] and direct[ed]" Koo and Koopman. *Id.* (quotations omitted). To be sure, as we previously explained, we believe that Koo and Koopman engaged in state action when they exercised state police power to detain Warman. *See supra* Part III.A.2.ii. But we must evaluate whether "the specific conduct of which the plaintiff complains" is state action for each of Warman's claims. *Lindke*, 601 U.S. at 767 (citation omitted). With regard to his claim that MSJU's vaccine policy violated his free exercise rights, the "specific conduct" at issue, *id.*, is MSJU's denial of Warman's religious exemption. Warman does not explain how that denial—a private administrative decision made by the private employees of a private university—is an exercise of state power. Indeed, that denial is wholly separate from MSJPD's police activities.

Consequently, we affirm the district court's dismissal of Warman's free exercise claim as to all defendants.

## C.

Warman's equal protection claim fares no better. The Equal Protection Clause prohibits state actors from "intentionally treat[ing] one differently than others similarly situated without

any rational basis for the difference." *TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 788 (6th Cir. 2005).

Warman brings his equal protection claim against MSJU, MSJPD, Elliott, Metzger, Ellerman, Hinzman, Koopman, and Koo. His complaint states that "[n]umerous other students were on campus, including others who were unvaccinated, and none received the treatment provided to [] Warman[.]" (Second Am. Compl., R. 18, PageID 323.) But he fails to "allege, with particularity, facts that demonstrate what *each* defendant did" to single him out or treat him differently from other similarly situated MSJU students or employees. *See Ondo v. City of Cleveland*, 795 F.3d 597, 610 (6th Cir. 2015) (citation omitted). A "critical aspect of the § 1983 . . . universe is that to be held liable, a plaintiff must demonstrate 'that each [state actor] defendant, through the [defendant's] own individual actions, has violated the Constitution.'" *Robertson v. Lucas*, 753 F.3d 606, 615 (6th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 676). Warman's equal protection claim largely consists of nonspecific allegations that various defendants, through their mere involvement in enacting the university's vaccine policy, violated his constitutional rights by attributing wrongful acts to the whole group. This is insufficient. *See Ondo*, 795 F.3d at 611.

Warman thus fails to plausibly allege that any defendant violated his rights under the Equal Protection Clause. Since establishing the denial of a constitutional right is one of the "two essential elements" required to sustain a § 1983 claim, *Graham v. Nat'l Collegiate Athletic Ass'n*, 804 F.2d 953, 957 (6th Cir. 1986), we affirm the district court's dismissal of Warman's equal protection claim as to all defendants without proceeding to the next step of the analysis.

IV.

Next, we consider Warman's disability discrimination claim under 29 U.S.C. § 793 *et seq.* Section 793 concerns discrimination in employment, and Warman was not an MSJU employee. For the sake of judicial expediency, defendants overlooked the error and construed Warman's complaint as making out a claim under 29 U.S.C. § 794 ("Section 504"). The district court, dismissing any § 793 claim with prejudice, also addressed whether Warman made out a

claim under Section 504 and determined that he had not.  On appeal, Warman proceeds as if he had alleged a claim under Section 504.

Even when pleading under the correct provision, the claim falls short.  Section 504 of the Rehabilitation Act of 1973 prohibits "any program or activity receiving Federal financial assistance" from discriminating against an "otherwise qualified individual with a disability . . . solely by reason of her or his disability[.]" 29 U.S.C. § 794(a).  To properly state a claim for relief under Section 504, a plaintiff must show "(1) that he is disabled; (2) that he was otherwise qualified for the position; (3) that he was excluded solely by reason of his disability; (4) and that the relevant program is receiving federal financial assistance." *Doe v. Salvation Army in the U.S.*, 685 F.3d 564, 567 (6th Cir. 2012) (internal citation and quotation marks omitted).

Warman alleges that "at different times, in different ways, and in different combinations, [the defendants] purposely discriminated against [] Warman based on his actual and/or perceived disabilities." (Second Am. Compl., R. 18, PageID 332.)  Even setting aside the failure to plead with particularity, Warman's complaint fails to allege how MSJU or its employees discriminated against him solely by reason of his disabilities when they refused his exemption request, even if they disregarded a doctor's note that apparently set out a medical need to avoid the vaccine. Warman does not allege what medical condition caused him not to take the vaccine.  And he also does not allege that MSJU or its employees forced his withdrawal from the university for failing to receive the vaccine—rather, Warman withdrew from the university prior to the date mandating all students to demonstrate proof of vaccination.

Accordingly, we affirm the district court's dismissal of Warman's disability discrimination claim against all defendants.

V.

Warman also asks us to reinstate his state-law claims in light of the district court's decision to decline to exercise supplemental jurisdiction. We review a district court's declination of supplemental jurisdiction for an abuse of discretion. *Veneklase v. Bridgewater Condos, L.C.*, 670 F.3d 705, 709 (6th Cir. 2012).

The district court declined to exercise supplemental jurisdiction because it had dismissed all federal claims. Because we reinstate Warman's Fourth Amendment claim, that rationale no longer applies. We therefore vacate the dismissal of Warman's state-law claims against all defendants but MSJPD and "remand the proceedings to the district court to allow it to address the question of whether it wishes to exercise supplemental jurisdiction over the state law claims given that a federal claim remains pending." *Veneklase*, 670 F.3d at 716.

VI.

Finally, Warman contends that the district court abused its discretion by dismissing his claims with prejudice and denying him leave to amend. A district court's dismissal of a complaint with prejudice is generally reviewed for abuse of discretion. *Crosby v. Twitter, Inc.*, 921 F.3d 617, 622 (6th Cir. 2019). While, ordinarily, a district court dismissing a claim with prejudice must state its reasons for doing so, a plaintiff is first required to file a formal motion for leave to amend the complaint. *Id.* at 627. It is, therefore, not an abuse of discretion for a district court to dismiss a claim with prejudice if the party has not moved to amend or proposed an amended complaint. *CNH Am. LLC v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. (UAW)*, 645 F.3d 785, 795 (6th Cir. 2011).

Warman did not file a formal motion to amend. As such, the district court did not abuse its discretion in denying him leave to amend. In any case, on appeal, Warman seeks leave to amend specifically to clarify that Koopman and Koo told Warman that he was not free to leave. Since Warman already plausibly alleged that he was not free to leave in his complaint, further opportunity to draft his complaint would offer no additional evidence or argument for the district court to consider. *See, e.g.*, *Libertarian Nat'l Comm., Inc. v. Holiday*, 907 F.3d 941, 948 (6th Cir. 2018).

VII.

For the foregoing reasons, the district court's decision is affirmed in part, reversed in part, and remanded in accordance with this opinion.